Mr. Dagnall, is that the way you pronounce it? Dagnall, Your Honor. Dagnall, okay. You may proceed. May it please the Court. Your Honors, Braintree didn't begin the commercial development and clinical studies of the brain tree for SupRep until 2006, after the 149 patent issued, and six years after its January 2000 invention date. For whatever reason, Braintree didn't proceed with one of the 330 milliliter solutions that met the fleet colon cleaning benchmark, but instead commercialized a product with a volume of 940 milliliters. So now, Braintree is trying to take this later developed square peg that is SupRep and fit it into an earlier... Well, in fairness, I mean, you've described it. I'm not suggesting the way you described it was unfair, but the other way to describe it is that the product that's on the market is really two dosages, two separate dosages to take at a separate time, and each of those is clearly covered by the 149, correct? No, Your Honor. If you look at the... The patent describes the solutions as 330 milliliter solutions that are divided into 165 milliliters taken the evening before colonoscopy and the morning of the colonoscopy. So the effective volume is 330 milliliters. It's not 2x. It's not 660. So what Braintree is doing is simply taking a product that has 940 milliliters and is administering that product in two doses, a split dose regimen. You're referring here to column 5, line 19 of the patent? Yes, Your Honor. And then the patentee, yes, Your Honor, at column 5, 64 through column 6 at line 3 describes the experimental solutions. And then the patentee... Well, I would have thought that line 19 was more relevant where it says optimally the patient in two or more administrations. Yes, Your Honor. That's where the patentee describes the divided dose aspect that you mentioned. The question that we're facing is whether the split dose, as it's referred to on the label, should be considered to be a single dose, in which event it's 940 milliliters outside the scope of the patent, or whether it should be treated as two separate doses, in which event each single dose is within the volume limitations of the patent, right? That is the argument as Braintree framed their construction, but if you look... No, no, what's the matter with my framing? No, exactly, exactly, Your Honor. Yes, so as you said, Your Honor, but what is wrong with that point we submit, Your Honor, is that what Braintree is saying is that one single bottle, one single bottle is a composition that falls within the claims of the patent. The other dose, the other half dose, is another composition that falls within their claim interpretation. So each bottle is its own independent composition, and when you look at the patent, the patent talks about the effective volume inducing a colon clean catharsis. It's undisputed, Your Honor, that Braintree says that one bottle induces... Well, all of this hinges, does it not, on our accepting that purgation is the same as If we don't accept that, if we think the two are separate and distinct, then you lose, right? Am I right? Well, Your Honor, then Braintree has the obligation to prove that one bottle of Suprep, in fact, induces the evacuation of a copious amount of stool. If I understand your brief correctly, there are two different arguments here with respect to this aspect of the case. One of them is that purgation means cleansing, and let's assume that we reject that and we say that purgation can either mean causing copious amounts of stool or cleansing. But is there still an argument at that point that even if purgation can mean either cleansing or partial cleansing, that still the volume that is required by the NDA and the ANDA here is 940 milliliters and that it makes no difference that it's split into two parts? No? Yes, Your Honor. No, the volume is 940 milliliters. But that doesn't depend, does it, on the question of whether purgation includes both cleansing and copious amounts of stool? No, Your Honor. You're right. I mean, Novel is seeking approval of a composition that is 940 milliliters. That is what the FDA approved label talks about, and that is the volume of Novel's product. And that's also consistent with representations that Brain Tree made to the Patent Office in their patent term extension request, where they had a claim chart, claim 15, and they said that the volume of the aqueous hypertonic solution that is SupRep is 940 milliliters. That is the volume in their claim chart where they represented induces purgation of the colon. Well, why shouldn't that be considered to be two separate doses, each of which is measured against the patent? Because, Your Honor, one dose induces the evacuation only of a copious amount of diarrhea. One dose does not… No, forget about that argument. Forget about it. Suppose we disagree with you. Suppose we construe purgation as meaning either cleansing or copious amounts. Does it make any difference? Because the NDA and the ANDA both require 940 milliliters. It doesn't make any difference what the purpose of it is. It's still 940 milliliters. It seems to me that the argument is there's infringement because it's two separate doses. No? That's their argument. That is their argument, Your Honor, but you're right when you say that the volume is 940 milliliters and that volume falls outside the 100 to 500 milliliter claim range. So why shouldn't it be treated as two separate doses? That's the issue. Well, Your Honor, two separate doses of 473 milliliters you're talking about and another 473 milliliters. That is, in our view, turns on the claim construction of purgation. No, it doesn't. Even if you lose on the claim construction, it's still 940 milliliters. You're right, Your Honor. Yes, you are right. And that's why I thought I mentioned that the 940 milliliter volume of Novel's product falls outside that volume limitation of the claims. So there is no infringement. Can I move you on to the second kind of issue here, the clinically significant electrolyte issue? Yes, Your Honor. I'm not clear. It seems that, let me see if you agree. You've got, this goes to the patient part of the limitation, not necessarily to the and or part. Let's assume we agree with you on the and or. What are we left with? They're saying that if one patient, you're saying that if one patient demonstrates that they're outside of this significant thing, then there's no infringement. They're saying if one demonstrates that they're within, there is infringement. I'm not comprehending that. Is that correct? Is that the position being taken with respect to even if we accept your claim construction? Yes, Your Honor. When you look at the claim limitation, the claim language says that the compositions cannot produce any clinically significant electrolyte shifts. That is the limitation in the claim. If this patent is construed to be a patient, so that works once in one patient, then certainly, Your Honor, with that construction in mind, this patent would be obvious to a person who already has a skill in the art at the time of the invention. Sulfate salts were long known to produce purgative effect. Braintree is essentially saying that the composition can produce clinically significant electrolyte shifts. But you lost that question to the district court, right? I mean, you argued obviousness and after a bench trial, they found no obviousness. Well, Your Honor, I believe that the district court was evaluating the obviousness issue in the context of purgation, meaning colon cleaning. In fact, when Braintree talks about supposed unexpected results, they're characterizing those unexpected results in the context of colon cleaning. And they're also forgetting that under their construction, the patented compositions only need to be effective in one patient. Well, that's what I'm getting back to. So just stick with me on the claim construction. Let's assume we agree with your claim construction with regard to the and or piece of this. Where does that leave you in terms of what that means for infringement? Is it your view that if 1,000 people take this and one of them has this clinically significant shift, then there's no infringement? Yes, Your Honor. And that's because— And their view is the exact opposite, right? If one person—and that was the district court's view. If one person takes it and there's no shift, then there's infringement for everything, right? Do either of those arguments make sense to you? Well, Your Honor, Braintree's the patentee, and they were the ones who drafted the claim to include a negative limitation in the claim. Well, that can't be. That one patient either way makes it infringing or not infringing, that strikes me as a ridiculous argument. The question is, what does this claim language mean? And it has to mean something in context. At least, it seems to me, it has to mean that a substantial number of patients are experiencing electrolyte shifts outside of the normal range, not just one, right? Well, Your Honor, again, if you look at the specific lexicography in the patent, they talked about blood chemistry alterations— Answer my question. Your Honor, we believe— Well, it can't be just one, right? That's aberrational. I mean, any sensible person reading this patent would think that it must mean that a significant number of patients experience shifts outside the normal range, no? Well, Your Honor, that's not our argument. Our argument is that— I know it's not your argument, but isn't that, as a matter of common sense, isn't that what somebody looking at this patent would think? Well, Your Honor, I think you are correct. But the fact is— Wait. You didn't argue that to the district court. You argued something different. Exactly. So you think that's correct now, and you've abandoned your other argument because they're not consistent. No, no, Your Honor. We haven't abandoned our argument. Our argument is driven by patent law, which says that when a patentee acts as its own lexicographer— And you're saying that Collins, too, he said they define clinically significant, right? And that you're definite—that you argue that, right? Yes. Yes, Your Honor. At Collins, too, they define they should be bound by that definition. Exactly. And Braintree is the party that inserted this negative limitation into their claims. They say that the claim compositions cannot produce any clinically significant electrolyte shifts. This is a result, absurd as it may be— I understand. Would it be fair to say that while in FDA law one might use the term clinically significant to equate to statistically significant, that is not the way in which the term was defined in this patent? It wasn't the way it was defined in this patent. You're right, Your Honor. And that's what we're— I don't see anything in the records that discuss any. I mean, it seems to me that if you've got an argument to be made, it's really just use of the word any. Your Honor, that— That may make this unique in terms of your interpretation. But I didn't see you pressing that argument anyway. Your Honor, any in our minds means any. It's clear. The negative limitation is clear. And that's why we—our argument is specific. Was there any expert testimony below with regard to how one in the art would construe for purposes of, you know, what Judge Dike was referring to? Are we looking—when we say, when we use the term clinically significant shift, are we looking at generally the population and then ascertaining what percent would be clinically significant with respect to the patient population? Your Honor, there was testimony about physicians evaluating patients for the effects on their health. But the district court also noted that that subjective analysis was too open-ended. In fact, if you look at the examiner— There is data in the record, right, for the Phase II and the Phase III trials. And the Phase II trials, if my computation is correct or my clerk's computation is correct, shows 50 percent outside the normal electrolyte range. And for the Phase III trials, it shows 30 percent outside the normal range, correct? Yes, Your Honor. And those are significant numbers. I would submit those are significant numbers. In his brief, it admits that numerous patients experienced blood chemistry alterations outside the normal range. Those patients—and that data is described in Table II of the label at 924 and 925. It talks about the patients that experienced these baseline alterations in their blood chemistry. So your view, if you win this case no matter what, you don't have to rely on the one patient thing, that even if you relied on expert testimony about what one skilled in the art would think was clinically significant with respect to the patient population, you should still prevail on non-infringement. Yes, Your Honor, because there are many patients who have suffered these alterations in blood chemistry. That's correct. But just going back for a second, I realize that there are many patients who have, and all of that is clearly delineated in the record. But I'm trying to understand what the words statistical significance, despite the Phase II and Phase III, which are not included in the patent. Let me ask you, how could you have something statistically significant for a total sample of three people? I note that the preferred embodiment in this case, and every table in it, describes clinical significance in terms of only three people. It is statistically impossible, as you might imagine, to demonstrate statistical significance of the sample size of three. So does that not support your argument that clinical significance is about the effective amounts in a single patient and not about a statistical sample? Yes, Your Honor, it does. That's why I thought you argued for this report, but you haven't brought it up today yet, so I just wanted to make sure I understood it. And in fact, again, I have only a limited time for rebuttal. I'd like to, if I may. Okay, we'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Regan, or Reagan? Regan, Your Honor. Regan. May it please the Court for Braintree Laboratories. Let me begin, as I believe one of ordinary skill in the art would, with the context and structure of it. Let me ask you a question. Suppose the NDA in the ANDA here, instead of recommending a split dosage, said take the whole 940 milliliters at once. Would that be an infringement? I think that would be problematic as an infringement. But the ANDA does not, and the NDA don't speak in those terms. Okay, so your entire argument with respect to the volume limitation then turns on treating this as two separate dosages, correct? Correct. Each dose, each administration, is a separate purgation. And what was claimed here, as the Court knows, is a purgation, an administration of the 100 to 500 milliliters. Okay, but the problem, it seems to me, is that the patent, if you look at column 5, line 25, beginning there, contemplates that the 100 to 500 milliliter dose would be divided up into two separate doses. It says optimally the effective dose may be divided and administered to the patient in two or more administrations over an appropriate period of time. Doesn't that pretty clearly indicate that the 500 milliliter limitation is still in play, even if the dosage is divided into two parts? The 100 to 500 milliliter range is still in play in terms of each administration being up to that amount, but there's a distinction between what is claimed and what was the FDA indicated. Well, I'm not talking about the FDA right now. I'm talking about the patent specification itself in terms of understanding what is meant by 100 to 500 milliliters. Does not this language suggest that even if you divide it into two parts, the dosage into two parts, as is optimal according to the patent, that you still have to meet the 100 to 500 milliliter limitation? You have to meet the 100 to 500 milliliter limitation for the claims that deal with purgation and the administration of a single dose. Claim 23, which talks about the split dose regimen, is directed to this type of language in which two doses are being administered over the treatment period, one in the evening and one in the morning, Your Honor. So effectively what was going on in the structure of the patent is the two composition claims, 15 and 18, which were incorporated through a series into claim 23, are dealing with the purgation event, the physiological triggering event. And so you're saying that even if you follow the patent's recommendation and give a split dosage of 940 milliliters, that each dose still infringes? Yes, Your Honor. That does not seem to be consistent with what the specification says. I think it is, Your Honor, because if you look at the specification and you track it down to the lower portion of column 5, for instance, starting at line 49 and following and then over onto column 6, beginning at line 53 and following, that talks about two administrations, one in the evening, one in the morning, and the collection of stool that the inventors did after each administration. It's each of those administrations which was claimed as inducing purgation and which therefore each administration of the 100 to 500 milliliter dose would be an infringement. Where does that contradict the language that I read that talks about the divided dose? Well, I think if you go back... It says the effective dose, which means the 100 to 500 milliliter dose, no? Correct? Where it says effective dose? Right. That's referring to the 100 to 500? Right. The effective dose... Is the 100 to 500? It is. The effective dose being the dose that produces the copious diarrhea. Okay, but so it says may be divided and administered to the patient in two or more administrations over an appropriate period of time. Well, this is talking about one particular embodiment, Your Honor. If you look at the structure of the... If you go back to columns 1 and 2, and I think it's instructive to see how the specification was set out, purged and cleaned are set up as two concepts in line 18 of column 1, and then over in column 2 when it's talking about the phosphate, it talks about a tremendous osmotic effect being produced, the triggering event from the ingestion of the solution, and that's to be contrasted with what's in column 1 at line 25, which talks about the intestines being thoroughly... I understand, and you're probably right about that, that there's a difference between purgation and cleansing, but what this suggests is that if you tell somebody to take 940 milliliters in two doses, it's outside the 500 milliliter range, whatever the purpose of the two doses might be. Well, taking the two doses looked at collectively in order to thoroughly clean the colon would be outside of the range, obviously, because of the volume limitation, but the court's focus, given the structure of the claim, should be on each dose, not on the two doses collectively. It's the focus on each dose, which is what was claimed. Is it because... Can I ask a question? Is it because the 940 milliliters in your mind would result in cleansing, but that's not what the claim requires? Precisely. It requires only purgation and half of that dose is adequate to meet the purgation limitation? Precisely. Is that your argument? Precisely. And claim 23 really speaks to the cleansing concept because it's talking, as Judge Dyke referred to, two doses over the treatment period, and that's what... What if the ANDA were about dosage that is one right after the other? If there was a short interval, take five minutes later, take the second dose, or even immediately thereafter, take one dose and take the other dose. Would your argument be different? No. It would be the same argument that each dose... Just because you're taking two bottles rather than one. Right, because in that hypothetical, which would truly be a hypothetical, you would have a purgation, a copious watery diarrhea after the first dose in five minutes in your hypothetical. You'd take the second dose, you'd have another copious watery diarrhea. That would be the second purgation, Your Honor. That would be the second infringement. So each administration is an infringement. That's the way the claim was made. They could have claimed this differently. They could have claimed cleansing the collective dose of the 940 milliliters. That was not done except with respect to claim 23. Your Honor... But you're distinguishing Hector. You say you've got to consider what the instructions were, and there was no instruction to stop the administration with that first liter. So here, too, there's no instruction to stop the administration. The instruction, in fact, is to give the whole 940 milliliter dose. If there were instructions saying, well, you can stop at the first dose if you want to, you'd probably have a pretty good argument that that should be considered separately. But the ANDA, the NDA, and the label don't tell you to stop. They tell you to give the whole 940, right? The ANDA and the label do say that. With respect to Hector, the one liter in Hector was never administered to anyone. Well, that's the point, that your argument is that no one was told to stop after the first liter. I don't think it matters whether, Your Honor, respectfully, if you're told to stop or not to stop. The FDA indication, as we've discussed, is for two doses over the period of time. They have to be looked at separately with respect to each dose because of the structure of the claims. And each dose constitutes a purgation, which is the infringing event, the inducing of the purgation. The fact that there is no instruction to stop is, frankly, besides the point. It doesn't matter. If I could turn quickly to clinically significant electrolysis. Why don't you do that? Please do that. Your Honor, I think what is critical, of course, again, is the context of the specification. Why don't we start by humoring for a moment and assume that the claim construction is incorrect and the claim construction is what your friend says it is. Where does that leave us in this case? Because I'm confused. There's that issue, and then there's this one patient only issue, and you all take opposite sides of that. So assuming we reject the claim construction of the district court, where does that leave us? There would still be infringement because even under Novel's interpretation of the claim construction, which, as you know, is any value 0.001 outside of the upper or lower range, as was pointed out by Judge Dyke, there is a significant portion in the record of the clinical trial subjects who had no shifts at all with respect to that. But there's a significant portion that did have a shift, too. There are, but the fact of the matter is that Moore did not. So is that where we draw the line? There's infringement because 51 percent did not have shifts? That's your view? I mean, in the analysis here, each of you were taking the one patient theory, which strikes me as a little extreme. Well, actually, Your Honor, I think our theory was one or more. The court's case law says in Baldwin-Grafick… One or more have normal. You said if one or more have normal, which means 99 percent, if there are 100 patients, if 98 of them had these clinically significant shifts, there would still be infringement, in your view. Correct. Our view is that… And would that go to damages? I realize this is an ANDA case, and so it's mainly about an injunction, but would that go to a measure of damages? Meaning, if we had the view that this claim construction seemed absurd to us, but nonetheless was consistent with the spec, would the answer be damages? If it really is the case that 99 percent of their people are going to have problems, only one is not, or whatever, maybe would that be a measure of damages? It would bear on damages, but I think it's critical that the record you are reviewing is not this hypothetical. No, I get it. But you're asking the claim construction to, quite frankly, be the hypothetical, regardless of what the record is. Well, we're asking that the extreme of the claim construction be one. We actually are asking that the claim construction be one or more, which is consistent with what the court's decisions are. And we ask the district judge to apply one or more. When you say one or more, that's one. One or more. So you're essentially, it's fair to characterize your position as if one patient doesn't experience these shifts, there's infringement for every user of this compound? It's fair to characterize that in the extreme as a position of one, but on the record that was presented below and the expert testimony that was credited below, clearly by the district judge, he was looking at a situation in which a substantial number of people, first of all, had no shifts, and secondly, under the construction that we're urging, which is fully supported by the spec, which we haven't talked about, that that was supported because all of those out of the range that Judge Dyke referred to were classified by the clinical investigators as not clinically significant, using that term as it's used in the art and as it was expressed in this patent. But that's a different argument. I think what we're asking you to do is to assume that clinically significant here is specifically defined in the specification and means outside the normal range. And what we're focusing on, I think, is how many people have to be outside the normal range before there's non-infringement. The only data here that's in the summary judgment record are the Phase II and Phase III clinical trials, right? Correct, Your Honor. And that data speaks to a record which is not one, but more. And abstractly, we are asking for a claim of construction that would apply just to a single situation. Maybe you're not arguing this. I'm not sure. If I want to be sure, are you saying that there is a limitation in this claim somewhere? I think you're not arguing this, but I'm not sure you said yes to Judge Dyke, so I want to be clear about what you are arguing. Are you saying there's a limitation somewhere in this claim that requires you to establish a certain number of people who do not have the abnormal shift in order to successfully prove infringement? A percentage, 51%, whatever. Judge Dyke was referencing the studies, and you were saying yes to him in terms of, yes, the evidence shows this. But I didn't think that you were saying to him, yes, the claim requires that sort of thing. I thought you were still arguing you're one person, right? I am. I am clearly not saying that there's any requirement for Braintree to prove as a matter of its infringement burden a specified percentage of people. Your position is if even one person doesn't experience the shift, this composition is going to infringe. Correct. Under the court's law, which interprets A as one or more, we are just applying what the court has directed us to in the cases that we cited, Lava Trading and Bald and Grabber. So your argument is your evidence, i.e. the number of people that have no shift, supports the injunction you got. Because if we really were talking about that hypothetical of only one person, the injunction would seem an extreme remedy, right? If only one person out of the 500,000 people that take this product actually don't experience a shift, it would seem that offering an injunction in that case would be overkill. Correct, but that is not this record. My time has expired. So in conclusion, we would ask that the court's judgment be affirmed. Your Honor, thank you for two minutes. Your Honor, page 38 of Braintree's brief, they say that numerous patients experienced blood chemistry alterations outside their normal range. That is also found at Table 2, A924 and 925. Based on that data, there is no infringement. If the court were to revise the claim construction and find that clinically significant were to mean something beyond just one patient, Braintree admits that numerous patients experienced blood chemistry alterations, and the data supports that. Now, if the court is going to affirm the district court's broad construction of purgation to mean that this patent is about inducing the evacuation of a copious amount of diarrhea, then that broad construction must be applied with respect to obviousness. And, Your Honor, Braintree's expert, who is determined to be a credible witness, made factual admissions on cross-examination where he said a person of ordinary skill in the art, faced with the concerns of fleet, would not use sodium phosphate. Braintree's expert conceded that the idea of using a hypertonic sulfate salt solution for colon cleaning, for purgation, was known in the art before the 149 priority date. Braintree's expert stated that the tests and methods for determining whether a formulation induces purgation and produces shifts, those tests and methods were known to a person of ordinary skill in the art before the invention. Braintree's expert also conceded that sulfate salts are not readily absorbed, do not move into the body to create an imbalance, and are not associated with the side effects like fleet. So, if Braintree is saying that this patent is about sulfate salts for inducing only purgation, a copious amount of stool, without producing shifts, but it can produce some shifts, because Braintree is saying it can produce shifts, then certainly that composition would have been obvious to a person of ordinary skill in the art at the time of the invention. Thank you, Mr. Dagnon. Thank you for submitting.